UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

| UNITED STATES OF AMERICA | ) | |
| --- | --- | --- |
| | ) | |
| V. | ) | |
| | ) | 18-CR-52-DBH |
| ERIC MALMSTROM, | ) | |
| Defendant, | ) | |

**SENTENCING MEMORANDUM**

On March 12, 2018, Eric Malmstrom was brought to the United States District Court for the District of Maine for an initial appearance on a one-count criminal complaint charging him with making a threatening telephone call to an employee of the Swedish Embassy. Although the complaint detailed a multitude of telephone calls, the indictment involved only four specific telephone calls. The government dismissed the charge related to one of the four telephone calls in advance of the trial in this matter. On August 27, 2018, Eric Malmstrom was convicted by a jury of three counts of transmitting threatening interstate communications in violation of 18 U.S.C. § 875. These convictions were related to telephone calls on February 23, 2018, March 5, 2018, and March 6, 2018.

As part of its investigation, the Government obtained medical records and other documents related to Mr. Malmstrom's mental health from the United States Army. The Government provided these records to United States Probation as part of its pre-trial bail investigation. United States Probation also engaged in conversations with Mr. Malmstrom's relatives who also provided information about Mr. Malmstrom's mental health. These accounts

of Mr. Malmstrom's mental health, supported in part United States Probation's conclusion that Mr. Malmstrom was a danger to the community. United States Probation asserted the opinion that the defendant could be released following a psychiatric or psychological evaluation where a current diagnosis is established, and a medication regime is prescribed.

By the time of the pre-sentence report, Mr. Malmstrom began asserting a privilege to his mental health records and refused to provide releases to United States Probation. While Mr. Malmstrom acknowledged a diagnosis and some mental health problems, he refused to provide details. United States Probation used records from the United States Army, the Maine Department of Corrections, and Mr. Malmstrom's relatives for reporting that information. United States Probation used releases provided by Mr. Malmstrom that it knew had been revoked, acquired information for which the privilege had not been waived from his family, and took custody of records from the Maine Department of Corrections.

### I. The records related to Mr. Malmstrom's mental health are privileged and the privilege has not been validly waived with respect to those records.

The United States Supreme Court resolved a split among the circuits and recognized the psychotherapist- patient privilege. It found the cost of not protecting statements was outweighed by the need to ensure that patients could seek treatment without fear that their statements would be used against them:

> Because we agree with the judgment of the state legislatures and the Advisory Committee that a psychotherapist-patient privilege will serve a "public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth," *Trammel,* 445 U.S., at 50, 100 S.Ct., at 912, we hold that confidential communications between a licensed psychotherapist and her patients in the course of diagnosis or treatment are protected from compelled disclosure under Rule 501 of the Federal Rules of Evidence.

*Jaffee v. Redmond*, 518 U.S. 1, 15, (1996). In this case, Mr. Malmstrom claims that this privilege applies to a series of records. First, the 1999 medical records from the United States

Army.  Second, the State of Maine records from the Maine Department of Corrections, the State of Maine Forensics Service, and the Riverview Psychiatric Center.  Third, the Pretrial Services records obtained from Mr. Malmstrom's relatives and Islands Community Medical Services.  Because this issue over Mr. Malmstrom's mental condition was raised by the Government with Army records subject to the privilege, because Mr. Malmstrom has not raised any claim putting his mental condition at issue, and because any waiver was involuntary due to the penalty of incarceration, the records should not be considered by this Court.

The Supreme Court acknowledged that its recognition was not a complete articulation of the how the privilege would apply in every case and that further development would be on a case by case basis.  The Court acknowledged that it was possible to waive the privilege: "Like other testimonial privileges, the patient may of course waive the protection." Id. at n.14.  The Court also explained that the privilege may not be absolute:

> Although it would be premature to speculate about most future developments in the federal psychotherapist privilege, we do not doubt that there are situations in which the privilege must give way, for example, if a serious threat of harm to the patient or to others can be averted only by means of a disclosure by the therapist.

*Id*. at 18 n.19.  These exceptions are at the heart of dispute in this case.  The Army does not recognize the privilege and failed to protect Mr. Malmstrom's medical records.  See *United States v. Rodriguez*, 49 M.J. 528 (1998) (explaining that the privilege does not apply for purposes of the Uniform Code of Military Justice).  Because there was no waiver for these records to be used for civilian purposes, the Court should not consider the records or address the issue raised by them.

The First Circuit has recognized the psychotherapist-patient privilege and the holding of *Jaffee*.  The standards for asserting the privilege have been in place for a significant amount of time:

> As a general matter, a party asserting a privilege has the burden of showing that the privilege applies. *See* 3 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 503.06[7] (2d ed.1997). To do so, the proponent of the privilege must set forth facts sufficient to establish all the elements of the claimed privilege. *See Holifield v. United States,* 909 F.2d 201, 203–04 (7th Cir.1990); *cf. In re Aug., 1993 Regular Grand Jury,* 854 F.Supp. 1392, 1398–99 (S.D.Ind.1993) (suggesting that a blanket assertion of the psychotherapist-patient privilege would be insufficient). Hence, a party asserting the psychotherapist-patient privilege must show that the allegedly privileged communications were made (1) confidentially (2) between a licensed psychotherapist and her patient (3) in the course of diagnosis or treatment. *See Jaffee,* 518 U.S. at 15, 116 S.Ct. 1923.

*In Re Grandjury proceedings (Gregory Violette)*, 183 F.3d 71, 73 (1st Cir 1999). The material that Mr. Malmstrom claims the privilege for meets the criteria. The statements regarding Mr. Malmstrom's mental health are clearly confidential in that they were made to medical doctors, psychiatrists, or licensed psychologists and protected by law as health care information. It is also clear that Mr. Malmstrom was a patient at the time he made the statements for which he claims the privilege. It hardly seems controversial that he made the statements in the course of diagnosis or treatment from which the conclusions were formed about his mental condition. What is really at issue here is an exception or a waiver of the privilege.

The Ninth Circuit has recognized that the Circuits are split on the existence of a dangerous patient exception to the privilege. The Ninth Circuit summarized the two positions:

> We are faced with an even split between the two circuits that have considered the question under Rule 501. That is, whether we decide that there is a dangerous patient exception to the federal psychotherapist-patient privilege, or that there is not, we will have company. The Tenth Circuit has said that a psychotherapist may testify about a threat made by a patient if "the threat was serious when it was uttered and ... its disclosure was the only means of averting harm ... when the disclosure was made." *United States v. Glass,* 133 F.3d 1356, 1360 (10th Cir.1998). This is the approach that the district court and the three-judge panel took. *Chase,* 301 F.3d at 1024. By contrast, the Sixth Circuit has held that there is no dangerous-patient exception to the psychotherapist-patient privilege. *Hayes,* 227 F.3d at 585–86. We agree with the Sixth Circuit for the four reasons that follow.

*United States v. Chase*, 340 F.3d 978, 985 (9th Cir. 2003). The Ninth Circuit Panel reasoned that disclosure for a limited purpose of confidential information did not prevent application of the privilege. Mr. Malmstrom asserts that this dangerous patient exception is the basis of the disclosure by the United States Army. Like the information in the disclosure in *Chase*, that use of the information did not prevent Mr. Malmstrom from asserting the privilege. The fact that the United States Army turned over the information to the Government in this prosecution has no effect on the assertion of the privilege.

The Fourth Circuit recognizes that the privilege can be waived as part of the punishment for criminal behavior. In the Fourth Circuit's view, accepting conditions as part of punishment is a perfectly valid waiver of the privilege:

> We therefore conclude that Lara's agreement to be bound by the conditions of his supervised probation was both knowing and voluntary. Accordingly, we hold that Lara affirmatively has waived any psychotherapist-patient privilege that may have applied to the incriminating statements he made while participating in the treatment program. *See Jaffee*, 518 U.S. at 15 n.14, 116 S.Ct. 1923; *Bolander*, 722 F.3d at 223.

United States v. Lara 850 F.3d 686 692 (4th Cir. 2017). The government and probation suggest that Mr. Malmstrom waived the privilege both by signing releases and by allowing the information to be distributed. Not only does Mr. Malmstrom dispute this version of waiver, but also asserts that any waiver was the result of compulsion. Simply put, the records from the Maine Department of Corrections, the State Forensic Service, and the Riverview Psychiatric Center are all the result of an increased penalty for failing to participate. Mr. Malmstrom makes the same assertion with respect to the releases obtained by United States Probation Pretrial Services as part of its bail investigation.

Justice O'Connor would describe this very problem in the concurrence that established the plurality in *McKune*. In her view, the context of punishment did not resolve the problem with the penalty line of cases:

> The first three of these so-called "penalty cases" involved the potential loss of one's livelihood, either through the loss of employment, loss of a professional license essential to employment, or loss of business through government contracts. In *Lefkowitz,* we held that the loss of government contracts was constitutionally equivalent to the loss of a profession because "[a government contractor] lives off his contracting fees just as surely as a state employee lives off his salary." 414 U. S., at 83; contra, *post,* at 68, n. 11. To support oneself in one's chosen profession is one of the most important abilities a person can have. A choice between incriminating oneself and being deprived of one's livelihood is the very sort of choice that is likely to compel someone to be a witness against himself. The choice presented in the last case, *Cunningham,* implicated not only political influence and prestige, but also the First Amendment right to run for office and to participate in political associations. 431 U. S., at 807–808. In holding that the penalties in that case constituted compulsion for Fifth Amendment purposes, we properly referred to those consequences as "grave." *Id.,* at 807.

*McKune v. Lile*, 536 U.S. 24, 50 (2002) (Justice O'Connor concurring). Justice O'Connor specifically criticized the notion that conviction made a difference in the use of compelled testimony. Instead, she suggested that the real issue was the compulsion itself, calling any penalty that compelled a person to be a witness against themselves illegitimate. Mr. Malmstrom urges the Court to apply *Garrity v. New Jersey* to the statements made during any mental health examination, which was a mandatory part of his court proceedings in state court, term of imprisonment, participation in probation, and eligibility for bail and in so doing resolve the conflict created by *McKune*.

The issue is the remedial action taken in penalty cases. Mr. Malmstrom asserts that the compulsion justifies a self-executing privilege:

> The choice given petitioners was either to forfeit their jobs or to incriminate themselves. The option to lose their means of livelihood or to pay the penalty of self-incrimination is the antithesis of free choice to speak out or to remain silent.

> That practice, like interrogation practices we reviewed in *Miranda v. Arizona,* 384 U. S. 436, 384 U. S. 464-465, is "likely to exert such pressure upon an individual as to disable him from making a free and rational choice." We think the statements were infected by the coercion inherent in this scheme of questioning and cannot be sustained as voluntary under our prior decisions.

*Garrity v. New Jersey*, 385 U.S. 493, 497-498 (1967). The Supreme Court applied the privilege despite the fact that no claim was made based on compulsion. If anything, there is more compulsion inherent in the examinations as part of his punishment than there is in the loss of a job because of the penalty of prison. The Court should not consider the evidence of Mr. Malmstrom's mental condition.

**II.     The fact that the victim works for the Swedish Embassy does not make the victim an officer or employee of the Government for purposes of U.S.S.G § 3A1.2.**

The Government seeks to apply a six-point offense level enhancement to Mr. Malmstrom's guideline calculation. The pre-sentence report justifies the enhancement by concluding that the victim is a government official:

> The victim was a government officer or employee and the offense of conviction was motivated because of her status as an employee of the Swedish government. Further, the applicable Chapter Two guideline is from Chapter Two, Part A (Offenses Against the Person). Therefore, six levels are added. USSG §3A1.2(b).

Pre-Sentence Report at Paragraph 18. The pre-sentence report's conclusion is not justified by the facts. There is no statute, case, treaty, or convention cited that justifies the conclusion that an employee of a foreign government is a government officer, employee or family member of government officer or employee for purposes of U.S.S.G. § 3A1.2. The conclusion rests on the Government's failure to recognize that government refers to federal, state, or local government of the United States of America.

Broadly speaking the current version of the guideline uses the ambiguous term government, but there is no indication that the Guideline is meant to include foreign governments. The Current guideline was amended into its current form in 2004:

(a) If (1) the victim was (A) a government officer or employee; (B) a former government officer or employee; or (C) a member of the immediate family of a person described in subdivision (A) or (B); and (2) the offense of conviction was motivated by such status, increase by 3 levels.

(b) If subsection (a)(1) and (2) apply, and the applicable Chapter Two guideline is from Chapter Two, Part A (Offenses Against the Person), increase by 6 levels.

U.S.S.G. § 3A1.2. (West 2018). None of the application notes to guideline define the term "government" to include "foreign government." Only the Fifth Circuit has expressed the view that that guideline 3A1.2 includes foreign governments. *See United States v. Levario-Quiroz*, 161 F.3d 903 (5th Cir. 1998). The problem is that this conclusion is entirely divorced from the history of the guideline and the commissions' stated reason for expanding its reach.

Prior to 1992, guideline 3A1.2 was far narrower in its application and did not include state or local government officials. Amendment 455 removed the clear cross reference to a statute that was limited to the government of the United States of America:

> Section 3A1.2(a) is amended by deleting: "a law enforcement or corrections officer; a former law enforcement or corrections officer; an officer or employee included in 18 U.S.C. § 1114; a former officer or employee included in 18 U.S.C. § 1114", and inserting in lieu thereof: "a government officer or employee; a former government officer or employee". The Commentary to §3A1.2 captioned "Application Notes" is amended in Note 2 by deleting: "are not expressly covered by this section. The court should make an upward departure of at least three levels in those unusual cases in which such persons are victims", and inserting in lieu thereof: "although covered by this section, do not represent the heartland of the conduct covered. An upward departure to reflect the potential disruption of the governmental function in such cases typically would be warranted". The Commentary to §3A1.2 captioned "Application Notes" is amended in Note 4 by deleting "law enforcement or corrections officer or other person covered under 18 U.S.C. § 1114" and inserting in lieu thereof "government officer or employee"; and by inserting the following additional sentence at the end: "This adjustment also would not apply in the case of a robbery of a postal employee because the offense guideline for robbery contains an enhancement (§2B3.1(a)) that takes such conduct into account.".

Amendment 455 U.S.S.G Appendix C 1992 (West 2018). 18 U.S.C. § 1114 is titled "Protection of officers and employees of the United States" and specifically applies to officers and employees of any branch of the "United States Government." At least one of the circuits recognized that prior to the 1992 amendment the guideline did not apply to state officials. *See United States v. Aman*, 31 F.3d 550 (7th Cir. 1994) (holding U.S.S.G. § 3A1.2 did not apply to a threatening communication made to a state court judge prior to the 1992 amendment.). The Government cannot ignore the history of this guideline while vastly expanding its reach to include foreign governments.

The commission expressed no intent to include foreign governments in its definition of government officer or employee. The stated intent of the 1992 amendment was to enlarge the breadth of the U.S.S.G. § 3A1.2, but made no mention of foreign governments:

> This amendment expands the coverage of this guideline to apply in the case of any government officer or employee, former government officer or employee, or a member of the immediate family of any of the above, who is targeted because of the official conduct or position of that officer or employee.

Amendment 455 U.S.S.G Appendix C 1992 (West 2018). Including foreign governments stretches the meaning of government under the guideline too far. Historically, this guideline has been limited to subdivisions of the United States Government and to the governmental entities at the state and local level. The Sentencing Commission has been noticeably silent on the issue of foreign government officials. The victim in this case simply does not qualify as a government official under U.S.S.G. § 3A1.2.

The Sentencing Commission continues to offer examples that focus on officers and employees of the United States Government. In its 2004 Amendment, the Sentencing Commission offered examples that focused on federal officials and employees:

> The amendment restructures §3A1.2 (Official Victim) and provides a two-tiered adjustment. The amendment maintains the three-level adjustment for offenses motivated by the status of the official victim, but increases the adjustment to six levels if that defendant's offense guideline was from Chapter Two, Part A (Offenses Against the Person). For example, a threat against a federal judge sentenced pursuant to §2A6.1 (Threatening or Harassing Communications) that is calculated at base offense level 12 could have received, before this amendment, a three-level enhancement under §3A1.2, which would have resulted in an adjusted offense level of level 15 and a guideline range of 18 to 24 months. Under this amendment, the defendant could receive a six-level adjustment, resulting in an enhanced offense level of level 18 and a guideline range of 27 to 33 months. The six level enhancement also applies to assaultive conduct against law enforcement officers or prison officials if the defendant committed the assault in a manner creating a substantial risk of serious bodily injury. This increase comports with the directive in the Act to "ensure punishment at or near the maximum penalty for the most egregious conduct covered by the offense" for offenses against federal officers, officials and employees.

Amendment 663 U.S.S.G Appendix C 2004 (West 2018). If the Sentencing Commission meant to include foreign governments it should have specifically mentioned foreign governments in its amendments. The Sentencing Commission has done this kind of specific inclusion into the guideline in the past. In 2002, the Sentencing Commission expanded the list of people included as prison officials for purposes of U.S.S.G. § 3A1.2. *See* Amendment 643 U.S.S.G Appendix C 2002 (West 2018). The Court should not interpret the Sentencing Commission's silence on foreign governments as authorization to apply the guideline to their employees.

### III. The threatening telephone calls to the victim were not motivated by her status as an employee of the Swedish embassy.

The Government alleges that Mr. Malmstrom's sentence should receive a three-level increase pursuant to USSG §3A1.2(a) because Z. B. should be considered an "official victim" under the Guidelines. It is not enough under the Guidelines that an alleged victim be a government employee, but the guidelines further require that the offenses of conviction should be motivated by that person's status as a Government employee.

The Pre-Sentencing Report states the investigator's conclusion that Z. B. was a qualifying victim under this guideline, but does not analyze why that is. The facts outlined in other

portions the report support the conclusion that at least some of the defendant's uncharged conduct was motivated by issues he had with the Swedish government. This conclusion does not apply to a finding that the specific threats at issue in this case were inspired by the same motivation.

These offenses that Mr. Malmstrom was convicted of occurred after Z. B. reported that the volume of calls from him was increasing and law enforcement officers conducted a welfare visit on Mr. Malmstrom at his home. It was at this point that Mr. Malmstrom's phone calls to Z. B. became personal, as he blamed her for the law enforcement attention on him. He specifically voiced his anger about this to Z. B. before embarking on the course of conduct that comprises these charges. It would be improper to conflate Mr. Malmstrom's motivations for originally calling the Swedish Embassy with his motivation for threatening Z.B. specifically and in a personal fashion on the occasions that comprise his convictions.

By contrast to the facts of this case, the Eleventh Circuit affirmed a conviction in *United States v. Bailey*, 961 F.2d 180 (11th Cir. 1992) where an individual robbed a postal employee specifically looking to steal money orders that the employee had access to because of their status. This case presents us with personal threats against a private individual for personal reasons who happened to become acquainted with the defendant in an official capacity. This case is analogous, rather, to *United States v. Harris,* 104 F.3d 1465 (5th Cir. 1997), in which a law enforcement office who was shot was found not to be an official person for the purposes of the Guidelines enhancement. There, the crimes that the defendant was actually convicted of were not motivated by the trooper's official status, and so the Court could not find a sufficient nexus to apply the guideline. *Id. at 1476.*

The facts fail to establish that the threats Mr. Malmstrom was convicted of having made against Z. B. were based upon her status as an employee of the Swedish government, rather than based on personal animosity. Accordingly, a three-point sentence enhancement under USSG §3A1.2(a) would be improper.

### IV. The three threatening telephone calls did not cause a substantial disruption to functions of the Swedish consulate.

The Government alleges that Mr. Malmstrom's sentence should receive a four-level increase pursuant to USSG §2A6.1(b)(4) for a substantial disruption of governmental functions and/or a significant expenditure of funds to respond to the offense. In determining what scope of Mr. Malmstrom's conduct should be considered for the purposes of this four-point enhancement, the Court should only consider such conduct as is "substantially and directly connected to the offense."

The Pre-Sentencing Report describes minimal factual basis for these conclusions. It states that the significant disruption of governmental functions stems from the Swedish Embassy's inability to reply to other voicemails while listening to the ones Mr. Malmstrom left. In support of the conclusion that significant resources were expended as a part of the investigation, it notes that many of the defendant's calls were forwarded to Stockholm, Sweden to be answered because they occurred after hours.

The disruption and resource expenditure alleged do not meet either a legal or common-sense definition of "substantial." In *United States v. Dudley*, 463 F.3d 1221 (11th Cir. 2006), the Eleventh Circuit conducted a detailed analysis of what substantial disruption of government functions looked like. The circuit applied a plain meaning analysis of the word "substantial" for these purposes. *Id.* In that case, the defendant mailed a threatening letter filled with talcum powder, intending to simulate an anthrax-laced mailing. *Id.* The Court found that the disruption

to Government business was substantial where several Court officers had to be quarantined, a portion of the state courthouse had to be evacuated and closed, and business was suspended for several judges. *Id.* In its ruling, the Eleventh Circuit quotes the District Court's ruling verbatim, "That seems pretty substantial to me." *Id. at 1226.*

The disruption alleged in this case simply does not arise to that level, or the to the level of anything that could be termed "substantial." There is no information about the number of voicemails that were not returned, how much embassy resources were consumed in dealing with Mr. Malmstrom, or what sort of impact his conduct actually had on the conduct of embassy business. The harm alleged is speculative at best and does not give the Court any quantifiable impact on which to base what would be a significant sentence enhancement.

On the issue of significant expenditure of Government resources, *Dudley* is likewise instructive. There, the Court found that significant Government resources had been expended in investigating and responding to that case where a hazardous materials response unit had to be mobilized to the courthouse, the FBI needed to conduct expedited analysis of the material in the letter while court officers were quarantined, and the judge to whom the letter was addressed needed to be placed under the protection of a 24 hour security detail. *Id. at 1226.*

In this case, by contrast, Mr. Malmstrom was arrested on the same day the threats were reported because he was already known to law enforcement, and there is no evidence of anything outside of ordinary measures having to be taken in response to his threatening conduct. The simple fact that his voicemails were transmitted to Stockholm because they were sent after hours should not be used to presume expense in our inter-connected world, in which data moves between states, countries, and continents routinely without any additional expense. The Pre-Sentence Report makes no finding that the transmission of these messages even

incurred a cost, simply stating that it was "likely." This is not a basis on which to subject the

defendant to the significant enhancement envisioned by USSG §2A6.1(b)(4).


      Dated this 29th day of January 2019                /s/ Robert C. Andrews
                                                                                 Robert C. Andrews
                                                                                 Attorney for the Defendant
                                                                                 Maine Bar Number 8980
                                                                                 P.O. Box 17621
                                                                                 Portland, Maine 04112
                                                                                 207-879-9850

# CERTIFCATE OF SERVICE

      I, Robert C. Andrews, certify that I have sent a conforming copy of this Sentencing Memorandum by electronic notification CM/ECF to the following parties


Craig Wolff, AUSA
Office of the United States Attorney
100 Middle Street
Portland, Maine 04104

This 29th Day of January 2019.

                                                                                            <u>/s/ Robert C. Andrews</u>
                                                                                            Robert C. Andrews
                                                                                            Attorney for the Defendant